[No. 12838.   Department One.   February 15, 1916.]

The State of Washington, *on the Relation of the Public Service Commission, Respondent*, v. Spokane & Inland Empire Railroad Company, *Appellant*.[1]

Electricity — Power Companies — Public Service Corporation— Private Business.   Companies furnishing electrical energy may or may not be public service corporations, since a sale of surplus power for private purposes is not an engaging in a public business.

Same—Power Companies—Private Business—Sale of Surplus Power—Right to Regulate.   'The contracts of a public traction company by which it sells to private individuals its surplus electrical power pertain to its private business in which the state can claim no concern, and disclosures as to such contracts are not essential to an intelligent exercise of the state's function to regulate the company's traction business.

Constitutional Law—Police Power—Legislative Questions.   It is the province of the legislature to define the objects of the police power, and for the courts to determine whether the act is reasonably within the legislative power and the thing sought to be done fairly within the act.

Electricity—Power Companies — Private Business — Power to Regulate—Police Power.   The courts will not declare the right of the state, under the police power, to regulate and control the price to be charged for electrical power sold to private individuals, in the absence of express legislative authority therefor.

[1]Reported in 154 Pac. 1110.

SAME—POWER COMPANY — REGULATION — RATES — PRIVATE BUSI-
NESS—POWER OF COMMISSION—STATUTES. The public service commis-
sion is given no power to inquire into the private contracts of a
public traction company whereby it sells its surplus electrical power
to private individuals, by 3 Rem. & Bal. Code, § 8626-1, declaring all
companies selling electricity for light, heat or power for hire, to be
public service companies, subject to regulation by the public under
the jurisdiction of the public service commission; since the entire
context of the act, providing for equality of service, physical valua-
tion of property "used for the public convenience in the state," and
that the commission shall ascertain the probable earning capacity
of each such company "under the rates now charged," relates only
to such uses as the public might compel, and the act nowhere seeks
to regulate or control the price to be charged to private individuals
in the incidental private business of selling surplus energy; there
being no clear intent to disclose or bring such private business
within the police power.

SAME. In such case, the "rates" falling within the scope of the
act, must mean a charge to the public for a service open to all upon
the same terms, and not a consideration of a private contract in
which the public has no interest.

Appeal from a judgment of the superior court for Spo-
kane county, Blake, J., entered January 26, 1914, in favor
of the plaintiff, in mandamus proceedings, tried to the court.
Reversed.

*Graves, Kizer & Graves,* for appellant.

*The Attorney General* and *Scott Z. Henderson, Assistant,*
for respondent.

MOUNT, J.—Respondent brings a mandamus proceeding
to compel a disclosure of private contracts.

The appellant is a traction company operating a street
railway system in the city of Spokane and some interurban
lines running out of Spokane into the surrounding country.
It maintains a power plant which generates about twelve
thousand horse power. Its present average need for its
operations is about nine thousand horse power. Some years
ago, at a time when its own power plant had not been com-
pleted, appellant entered into a contract to take each year

three thousand eight hundred horse power from the Washington Water Power Company, a power company operating in the same territory. With the development of its own plant giving approximately twelve thousand horse power, and the contract holding it to take three thousand eight hundred horse power from the Washington Water Power Company, appellant has a yearly supply of approximately sixteen thousand horse power, or about six thousand or seven thousand horse power more than its present average need, although at times it uses as much as twelve thousand horse power. This surplus it has sold under private contract to others and it has been put to various uses; its customers being a land company, one or two farmers who use the power for irrigation purposes, two manufacturing plants, a grain elevator, an irrigation company, and three or four individual owners of local electric light plants in towns and villages in the vicinity of Spokane.

The object of this proceeding is to compel appellant to submit its private contracts to the public service commission, it being the theory of the commission that it has jurisdiction over that part of the appellant's business which heretofore has been regarded as private and in which the state had no interest; that it cannot make an adequate and intelligent survey of the rates charged by appellant in its service to the public without them; and further, that to regulate the rates for traction purposes, it must have a disclosure of all contracts and all activities yielding a revenue to appellant, whether they be private—entered into with individuals—or affect a public service only.

We understand the law in this state to be that companies furnishing electrical energy may or may not be public service corporations, depending upon the objects for which they were organized and the business in which they are engaged; the logic of the cases being that we will judicially inquire whether the sale of power is a selling to the public generally or is only an incident to the business in which the company

is engaged, as, for instance, a sale pending a time when its
surplus will be needed to accomplish its assumption of duty
to the public; for it has been held that a public service cor-
poration can anticipate its future needs and develop energy
reasonably in excess of present requirements.   The char-
acter of such companies and their relation to the public has
been frequently considered by this court.   We find no de-
parture from our first holding that a sale of electrical energy
or power for private enterprises is not an engaging in a
public business, and gives such companies no right to assert
the sovereignty of the state.   *Healy Lumber Co. v. Morris,*
33 Wash. 490, 74 Pac. 681, 99 Am. St. 964, 63 L. R. A.
820; *State ex rel. Tacoma Industrial Co. v. White River
Power Co.,* 39 Wash. 648, 82 Pac. 150, 2 L. R. A. (N. S.)
842; *State ex rel. Harris v. Superior Court,* 42 Wash. 660,
85 Pac. 666, 5 L. R. A. (N. S.) 672; *State ex rel. Harris v.
Olympia L. & P. Co.,* 46 Wash. 511, 90 Pac. 656; *State ex
rel. Tolt Power & Transp. Co. v. Superior Court,* 50 Wash.
13, 96 Pac. 519; *State ex rel. Shropshire v. Superior Court,*
51 Wash. 386, 99 Pac. 3; *State ex rel. Dominick v. Superior
Court,* 52 Wash. 196, 100 Pac. 317, 21 L. R. A. (N. S.)
448; *Tacoma v. Nisqually Power Co.,* 57 Wash. 420, 107
Pac. 199; *State ex rel. Lyle Light, Power & Water Co. v.
Superior Court,* 70 Wash. 486, 127 Pac. 104; *State ex rel.
Weyerhaeuser Timber Co. v. Superior Court,* 71 Wash. 84,
127 Pac. 591.

In all of these cases, the company was asserting the right
of eminent domain in order to avail itself of the rights and
privileges granted by statute to public service corporations.
In the absence of controlling legislation, the court refused to
extend the right.   In the *Nisqually Power Co.* case, we even
held the use of the word "private" in a legislative act to
have been inadvertent and therefore surplusage.   The court
has not inclined to the thought that corporations not di-
rectly engaged in the sale of power to the public generally
should be clothed in the garb of the state, in the absence of

an unquestioned intent on the part of the legislature so to do.

The case at bar is presented from the other angle.  The company is insisting that its contracts with private individuals for the sale of excess power are of no concern to the state because they pertain to private business in no way affecting the public, while the state is insisting that such contracts are essential to an intelligent exercise of its admitted function to inquire into and regulate appellant's traction rates.  In other words, appellant rests upon the law as we have heretofore found it to be, and respondent insists that the court has indicated a purpose to relax the rule in the later cases: *State ex rel. Clark v. Superior Court*, 62 Wash. 612, 114 Pac. 444; *State ex rel. Lyle Light, Power & Water Co. v. Superior Court*, and *State ex rel. Weyerhaeuser Timber Co. v. Superior Court, supra; State ex rel. Mountain Timber Co. v. Superior Court*, 77 Wash. 585, 137 Pac. 994; or, if not, the act of 1911 (Laws 1911, p. 541, § 8; 3 Rem. & Bal. Code, § 8626-8) is ample to sustain the right of respondent to inquire into and control that part of the business of appellant which has heretofore been considered as private and not a proper subject of state control.

To review the cases in detail would serve no purpose.  We have discovered in them no purpose to depart from our former holdings.  There may be some expressions in cases involving collateral questions which seemingly touch the question under discussion and which may give impulse to the thought that we had it in mind to modify some of our decisions; but the fact remains that, whenever the exact question has been submitted to the court, it has held to the doctrine of the earlier cases, that is, that the sale of power to be used by others for traction purposes, lighting, manufacturing, etc., is not a public use, and that the sale of surplus power, or the difference between the ordinary requirements and the peak load by a corporation which does do a public service business, when such surplus is not in use, is only an incident to the public employment of which the law will take no no-

tice.    Notwithstanding the criticisms of counsel, there is sound reason for our former holdings, to which we shall advert when discussing the next phase of the case.

The final controlling question is whether the act of 1911 has extended the jurisdiction of the public service commission over power companies regardless of the character of the business in which they are engaged.    Counsel for respondent says:

"We may rest our case on the proposition that, irrespective of any question of eminent domain, the contracts of appellant are 'clothed with a public interest,' and therefore subject to regulation, and that the determination of the policy of regulation is for the legislature."

Counsel for appellant admits:

"The sole question in the case is whether the defendant's power business is a public business, in view of the uses to which the power sold by it is put, and is therefore subject to the jurisdiction of the public service commission.

"If it is within the legislative power to make public a business conducted as defendant's power business is, undoubtedly the legislature has done so and the case was rightfully decided.    It is an electrical company and owns an electric plant within the definitions of the statute.    (Laws 1911, p. 541, § 8; 3 Rem. & Bal. Code, § 8626-8.)    The act makes no distinction between an electrical company selling its product for public purposes and one selling for private purposes.    All such companies selling 'electricity for light, heat, or power for hire' are declared to be public service companies, subject to regulation by the public, and under the jurisdiction of the public service commission."

This leads us to a construction of the statute.    The purpose of the state in creating the public service commission was to regulate "public service properties and utilities."    In the *White River Power Co.* case, *supra,* we held the question whether the legislature could clothe power companies with a public character open, saying:

"We do not mean to say that the right of eminent domain can, in no case, be extended to a corporation organized for

the purpose of generating and transmitting electricity for power and other purposes. But before this can be done, public necessity must require it, and the right of the public to the use and the enjoyment of the property must be regulated, guaranteed, and safe-guarded by proper legislation."

It is argued that the present act (Laws 1911, p. 538; 3 Rem. & Bal. Code, § 8626-1 *et seq.*) furnishes ample authority for holding that public necessity, as evidenced by the legislative declaration, now requires that such companies be held subject to regulation in their private affairs, and that the right of the public to the enjoyment and use of such property is regulated, guaranteed, and safeguarded by appropriate legislation. But we think the act does not go so far. That it assumes jurisdiction over power companies and electrical companies may be conceded, but we find nothing that compels the conclusion that the legislature intended to inquire into or regulate such companies, except in so far as their business affects the right of the whole public to their products upon fair or reasonable terms.

Granting, for the sake of argument, the right of the legislature to exercise the police power to the extent of regulating and controlling the price to be charged for power sold to private individuals or to others, such right should not be declared by the courts in the absence of express legislation. The regulation and control of business of a private nature is sustained by reference to the police power, and even then it is sustained only when the courts have been able to say that a business is, in character and extent of operation, such that it touches the whole people and affects their general welfare. It is upon this principle that *Noble State Bank v. Haskell*, 219 U. S. 104, and *German Alliance Ins. Co. v. Kansas*, 233 U. S. 389, rest.

Until the legislature brings a business within the police power by clear intent, courts will not do so. Courts have assumed to say whether an act of the legislature falls within the police power, but primarily the assertion of police power

is for the legislature.  They are not disposed to hold that a thing should be done by an individual or by the whole public because the public welfare demands it.  They have acted only after the legislature has defined the object of the power.  In other words, the courts have never said primarily that the police power should be applied in any given case.  Their only inquiry has been whether a legislative act is reasonably within the legislative power and the thing sought to be done is fairly within the terms of the act.  And it is well that it is so, for the legislative body can extend the domain of the police power with sufficient rapidity.  There is no reason why the courts should engage in a rivalry with it.

At the time the act of 1911 was passed, the law was well defined and certain in its terms.  The sale of power to individuals or companies to be in turn sold was not a public use.  The rule and the cases declaring it must have been well understood by the legislature.  Yet the act nowhere attempts to cover any use theretofore deemed to be private.  Its whole context seems to compel the thought that it had in mind only such uses as the public might compel.  There is nothing to indicate a legislative intent to declare that the sale of surplus or secondary power pending a future use by a company in the performance of its public functions is a thing that affects the general welfare, the health, peace or happiness of the citizen, or that it is in any way necessary to sustain the right of the state to govern.

Neither has the business of selling surplus power been so notoriously beset by abuses that we can judicially notice it as having an outlaw character.  The right to regulate under the present law must be measured by the public interest.  It will hardly be contended that appellant's contracts with those to whom it sells its surplus is of any interest or concern to any one other than the immediate parties.  It is not alleged that it is neglecting its public duty because of them.  No one has a right to compel appellant to sell its surplus.

The act of sale is purely voluntary. Like the merchant, it can sell at one price to one man and at another price to another. The parties to the contracts are not complaining. If either is not content with the offering of the other he does not have to contract. He can go his way. But it is not so with appellant when exercising its public function, that is, furnishing something—a necessity—that all are entitled to receive upon equal terms, under equal circumstances and without exclusive conditions. Beale & Wyman, Railroad Rate Regulation, § 1.

The only interest the state can have in such contracts is that they may not be made and persisted in to the detriment of the public. They are made subject to the paramount undertaking of the company and must give way to the public interest if necessity requires. If at any time the state, acting through its accredited agency, puts a burden upon a public service corporation which requires the use of its surplus energy, it must devote such energy to the public use and abandon its private contracts, for they are no longer mere incidents to the undertaking in which the public has no interest, but are an incumbrance upon a public service. A private contractor could not compel specific performance of his contract as against an intervening public right. Thus reasoning, it follows that inquiry into these collateral matters is not essential to the performance of the public functions of the respondent. The commission insists that it cannot find a basis for rate making without knowing the private as well as the public affairs of the appellant. Granting that the appellant is entitled to a fair return upon its investment and the public to a fair rate of transportation, to hold that respondent could figure appellant's private contracts as a basis for rate making would in turn compel the holding that appellant would be entitled to take from the public enough to make good its losses in its private enterprises. The state has no interest, either in appellant's gains or losses in its

private enterprises. It has not yet assumed to stand as an inquisitor or conservator in private business.

The act creating the commission reflects no more than an intent to care for every right of the public in so far as they relate to the public functions of a public service corporation. It provided for equality of service, a physical valuation of "the total market value of the property of each public service company operating in this state, *used for the public convenience within the state*," and that the commission shall "ascertain the probable earning capacity of each public service company under *the rates now charged* by such companies," that is, rates for service falling within the scope and intendment of the law, for "rates" must be held to mean a charge to the public for a service open to all and upon the same terms, and not a consideration of a private contract in which the public has no interest.

This holding makes it unnecessary for us to inquire into the power of the legislature to assume a control over business of a private nature, or whether such an act, being passed, raises a legislative or judicial question. It is enough that the public service commission law does not go to that extent in its letter, and cannot be held to have gone to that extent by construction without doing violence to the manifest purpose and spirit of the law.

Remanded with instructions to deny the writ.

MORRIS, C. J., CHADWICK, and ELLIS, JJ., concur.

FULLERTON, J., concurs in the result.