## No. 13,481.

COLORADO UTILITIES CORPORATION *v.* PUBLIC UTILITIES COMMISSION ET AL.

(61 P. [2d] 849)

Decided June 22, 1936. Rehearing denied October 5, 1936.

Messrs. GRANT, ELLIS, SHAFROTH & TOLL, Mr. W. W.

190

GRANT, JR., Mr. ERL H. ELLIS, Mr. MORRISON SHAFROTH, Mr. HENRY W. TOLL, for plaintiffs in error.

Mr. PAUL P. PROSSER, Attorney General, Mr. RICHARD E. CONOUR, Assistant, Messrs. HUGHES & DORSEY, Mr. BERRIEN HUGHES, Mr. MYLES P. TALLMADGE, for defendants in error.

Mr. FRED A. VIDEON, amicus curiae.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

THE writ of error herein is prosecuted by Colorado Utilities Corporation, plaintiff in error, to reverse a judgment of the district court affirming a finding of the Public Utilities Commission, defendant in error, to the effect that Moffat Coal Company, also a defendant in error, is not a public utility within the meaning of section 2913 of the Public Utilities Act, chapter 46, Compiled Laws, 1921.

Moffat Coal Company was incorporated as a coal mining company about September 1, 1931, under Colorado laws, with its main plant and mine located at Oak Hills, Colorado, which is about three-quarters of a mile from Oak Creek, a town of about 1,500 inhabitants. The company extended a line over various properties, in which it held easements, for the transmission of electricity to be used in its mining operations at another mine owned by it, four miles north of its principal mine. The original transmission line was constructed in 1927 by its predecessor. Prior to October, 1932, the company generated electrical energy for its coal mining operations and to supply facilities for lighting the buildings used by it and its employees, and had a surplus over and above its needs, but never sold any of this excess except to Colo-

rado Utilities Corporation, for use on emergency occasions and then with the distinct understanding that in making the sale it was not operating as a public utility. Colorado Utilities Corporation had a franchise from the town of Oak Creek to supply electricity to its citizens which expired July 1, 1931. Owing to a disagreement, the town refused to renew the franchise on its expiration and its inhabitants at an election held September 10, 1932, voted to build a municipal electrical distribution system, and immediately thereafter constructed such system. The town then opened negotiations with Moffat Coal Company for electrical energy, but was advised by that company that it was not a public utility, that it did not intend to become such and that it would not negotiate with the town to supply it with any of its surplus electrical energy unless the town and plaintiff in error failed to come to an agreement leading to a renewal of the franchise. No agreement between plaintiff in error and the town was reached and October 15, 1932, a contract was entered into between Moffat Coal Company and the town, as a municipal corporation, whereby the former agreed to furnish and supply the town with electrical energy out of its surplus. The electricity received by the town under this contract was sold and distributed by it to its residents.

November 21, 1932, plaintiff in error complained to the Public Utilities Commission about the contractual agreement between Moffat Coal Company and the town, and requested the commission to require the company to show cause why it should not apply to the commission for a certificate of public convenience and necessity to operate as a public utility. November 26, 1932, on its own motion, the commission ordered Moffat Coal Company to show cause why an order should not be made requiring it to desist from operating as a public utility, and a hearing was had December 13, 1932. Moffat Coal Company moved for a dismissal on the ground that it was not a public utility; that it had not dedicated its

property or any part thereof to a public use; that it was not a public utility delivering electrical energy to the town; that the town, an indispensable party, was not a party to the proceeding; and that the commission had no power to make it a party. Over the objections of the company, plaintiff in error was permitted to intervene as a party to the proceedings before the commission. Upon full hearing, the commission, February 25, 1933, upheld the contentions of Moffat Coal Company, dismissed the case, and thereafter on March 17, 1933, denied intervener's petition for rehearing; whereupon intervener, now plaintiff in error, April 15, 1933, filed its petition for a writ of review in the district court, which court after overruling a demurrer of Moffat Coal Company and the commission, issued the writ May 23, 1933. After return was filed and on September 28, 1933, Moffat Coal Company and the commission moved to dismiss the writ upon the grounds that the commission had acted within its jurisdiction, had regularly pursued its authority, had not abused its discretion, and that the final determination made by it upon the questions of fact was not subject to review; that the commission did not violate any right of plaintiff and that plaintiff had no interest whereby it could rightfully intervene as a party to the action involving the subject matter before the commission; and that the petition for review does not state facts sufficient to justify a review. This motion was denied, the case was tried by the court, and October 20, 1933, it entered its order and judgment in favor of Moffat Coal Company and the commission. This judgment is now before us for review.

 Is Moffat Coal Company, under the facts presented, a public utility within the meaning of the Public Utilities Act? To be classed as a public utility it first must be determined that it is such because of the fact that it is an "electrical corporation" and is "operated for the purpose of supplying [electrical energy to] the public for domestic, mechanical or public uses * * * or declared

by law to be affected with a public interest * * *'' as set out in section 2913, supra.

It is undisputed that Moffat Coal Company—and its predecessors—since the corporate organization, has operated solely as a coal mining company, with no exception save the transaction involved under the contract with the town of Oak Creek hereinafter set out and considered. Its articles of incorporation were amended August 13, 1931, the amendment containing, among other things, the following: Power " * * * to construct and establish a plant or plants with all necessary equipment, rights and privileges for the manufacture and production of electricity, and to use, furnish, sell and supply the same. * * *.'' This part of the amendment is identical with an amendment of the articles of incorporation of a predecessor, The Oak Hills Coal Company, dated December 8, 1908. It is contended that this grant of power and the action thereunder, of which complaint is here made, brings Moffat Coal Company within the provisions and regulations of the Public Utilities Act. We do not so regard it. Moffat Coal Company made no dedication of its property or any part thereof to a public use; it made no offer, and did not hold itself out, to serve the public as a public utility as such term is used in the statute above mentioned but on the contrary steadfastly refused to engage in such operations as would bring it within the public utility classification. In its contract with the town of Oak Creek, which it is claimed constituted supplying the public with electrical energy, the company, by paragraph 9 thereof, specifically declared that it was not a public utility or service company; that by the contract it was not holding itself out or undertaking to furnish electrical power or energy to the public or individual residents of the town, and it reserved the right of nonperformance of the contract, should the Public Utilities Commission or similar body assert jurisdiction over it. Do the facts that it generated more electrical energy than was required for its own use as a coal mining company;

that upon solicitation, it sold and delivered a part of the generated product to a municipality; that by a contract of sale limiting the amount sold to its surplus or less and fixing the time between the hours of 6 o'clock a. m. and 6 p. m. when it might withdraw the supply without liability under its contract, make this company an electrical corporation subject to the control of the Public Utilities Commission? We think not, and so hold.

■ ■ The real question is: Did it become a public utility by the execution and performance of this contract? An affirmative answer requires a holding that by the contract, the company was supplying electricity to the public. The question can be resolved only by a reference to, and construction of, the contract itself which is as follows:

"Agreement

"This Agreement, Made and entered into in duplicate this 15th day of October, 1932, by and between the Moffat Coal Company, a corporation, duly organized and existing under and by virtue of the laws of the State of Colorado, hereinafter called the 'Company', party of the first part, and the Town of Oak Creek, a municipal corporation, organized and existing under and by virtue of the laws of the State of Colorado, hereinafter called the 'Town', party of the second part,

"Witnesseth:

"Whereas, the Company has a surplus of electrical power and energy over and above its needs in operating its coal mines and other properties and for its business and as incidental to its main business, is willing to sell and dispose of some of said surplus of electrical power and energy; and

"Whereas, the Town is about to contract for the erection and maintenance of certain electrical transmission and distribution systems in the Town and other territory in the proximity of said Town, all being in the State of Colorado, the said systems, consisting of transformers, transmission lines, distribution lines, meters, and other

equipment, apparatus, and appliances, and the said Town is to engage in the business of transmitting, distributing, and selling the electrical energy and electrical service by and through its said system in and to the said Town and the inhabitants thereof; and

"Whereas, the Town is desirous of contracting for the use of some of the said surplus of electrical power and energy of the Company,

"Now, Therefore, for and in consideration of the sum of one dollar ($1.00) paid by each of the parties to the other, the receipt of which is hereby confessed and acknowledged, and in further consideration of the mutual covenants and agreements hereinafter expressed by the parties hereto, to be kept and performed respectively, the parties hereto covenant and agree to and with each other as follows, to-wit:

"1. The Company shall supply and furnish the Town out of its surplus of electrical power and energy, and the Town shall take and purchase from the Company during the term of this agreement, hereinafter specified, and while the same continues in force and effect, all electrical energy and electrical service which the Town shall need or use for distribution in said Town and territory hereinabove referred to and covered by said distribution system and any and all extensions thereof, except as limited herein.

"2. All electrical energy shall be delivered by the Company at a point on the boundary of the Company's property adjacent to the Town. Said energy shall not exceed one hundred fifty (150) kilowatts per hour and shall be in the form of sixty (60) cycles, three (3) phase alternating current at a pressure of approximately twenty-two hundred (2200) volts; provided, however, that if the Company should need its surplus electrical energy in the operation of its properties between the hours of 6:00 A. M. and 6:00 P. M., it shall have the right to use all or any part of such surplus, and to limit or restrict the supply furnished the Town to less than one

hundred fifty (150) kilowatts per hour during said hours without being in any way liable to the Town therefor. If at any time said Town shall need more electrical energy than said Company is able or willing to furnish the Town out of its surplus, the Town shall be at liberty to supply its needs in excess of the amount which the Company is able or willing to furnish from any other available source or sources, until such time as the Company is again ready to supply the needs of the Town.

"3. The Town at its sole expense shall supply and maintain during the term of this agreement its distribution and transmission system as above referred to.

"4. That all electrical energy and electrical service furnished by the Company to the Town pursuant to the terms of this agreement shall be furnished by the Company, and received and paid for by the Town at the rate of two cents ($.02) per K. W. H., as metered at the point of delivery, necessary meters to be furnished and maintained by the Town at its expense. If for any reason power furnished by the Company shall fail to be registered by the meters, the amount of such power shall be determined arbitrarily and payment shall be made on the basis of the amount delivered during the 30-day period next preceding such failure.

"5. On or before the 10th day of each month the Company shall render the Town a statement for electrical energy furnished the Town during the preceding month and payment therefor shall be made by the Town within five days after the receipt of such statement. If for any reason the Town shall fail, neglect, or refuse to make said payment in full for any amount due the Company within thirty (30) days after payment is due, the Company shall have the right and option upon ten days' written notice to the Town of such default to terminate this contract; and after any such termination, the Company shall be under no further obligation or liability hereunder.

"6. Except as otherwise provided herein, all pay-

ments due the Company from the Town under this contract shall be made out of the revenue to be received by the Town from the operation of its municipal electric light system. By entering into this contract the Town does not incur any obligation to make payments out of its general funds or any fund raised by taxation; provided, however, the Town shall collect and pay the Company for electrical energy delivered by the Company at a rate not less than that specified in Section 4 hereof; and provided further that the Town shall pay for street lights and other municipal service at a rate not greater than that charged other consumers in said Town; and provided further that if for any reason the Town should not be able to pay the Company all amounts in full due it from the Town out of the Town's electric light revenue, the Town shall be liable for and shall be bound to pay the Company any and all deficiencies.

"7. The Town shall indemnify and hold harmless the Company for any and all injury or damage or claims for injury or damage to persons or property occurring in the Town's side of the delivery point, and for all costs or expenses resulting from any such claim or claims, and the Town shall carry compensation insurance on all employees in any way connected with the handling or distribution of the electrical power. Suitable rules and regulations for the delivery of the power from the Company to the Town shall be agreed upon between the two parties in order to avoid the possibility of accidents.

"8. That service contemplated by this agreement shall commence on the first day of the month after completion of the distribution system by the Town and not later than July 1, 1933, and service shall continue thereafter for a period of twenty (20) years, which period of twenty (20) years shall be deemed and taken as the term of this contract; provided, however, that the Company shall have the right to terminate this contract by giving six months' written notice of termination to the Town, and at the end of such six months period all rights

and obligations hereunder shall cease. Neither party shall be liable to the other for damages because of interruptions or failure to deliver or to take current when such interruptions or failure to deliver or take current shall be caused by acts of God, war, interference of Governmental authority, accidents, fires, explosions, or other causes beyond the control of the parties, and the Company shall be relieved from making any deliveries of power in case of strikes, lock-outs, riots, civil commotion, or any so-called labor disturbance, making it impossible to operate its mines to normal capacity.

"9. The Company is not a public utility or service company and by entering into this contract is not holding itself out or undertaking to furnish electrical power or energy to the public or to the individual residents and inhabitants of the Town or other territory in the proximity of said Town and nothing in this contract shall in any way be construed to place the Company under the duties, rights, or obligations of a public service company. Should the Public Utilities Commission or any similar body assert any jurisdiction over the Company, such Company shall have the option of performing under this contract or not performing, as it shall deem best, without any liability on account of any action taken in the premises.

"10. It is agreed that the Company is hereby contracting to sell only such part of its surplus power and energy as it may not need in the conduct of its own business. The Company reserves the right to sell power or energy to other mines or others, as it sees fit, provided, that so long as the Company has surplus energy after operating its own properties, the Town shall have a right to such surplus to the extent of its needs, not exceeding one hundred fifty (150) kilowatts per hour, which shall be prior to the right of any other purchasers of energy from the Company, and in entering into any contract for the sale of electrical energy to other purchasers the Company shall expressly provide for such prior right.

"11. It is understood and agreed that this agreement and all of the covenants herein contained shall inure to and be binding upon the successors and assigns of the parties hereto respectively.

"In Witness Whereof, the parties hereto, pursuant to official action by their respective Boards of Directors and Trustees, have caused these presents to be executed in their corporate names, by their duly authorized officers, and attested by their respective corporate seals, the day and year first hereinabove written.

"Moffat Coal Company,
By E. S. Kassler, President.

"Attest:
Van Holt Garrett, Secretary."
(Seal)

"The Town of Oak Creek,
By Joseph Mathews, Mayor."

"Attest:
Ed Sumner, Clerk."
(Seal)

Moffat Coal Company, under its amended charter, had the power to generate and sell electrical energy, but by such charter it did not have express power to do so as a public utility. However, had its charter contained such express provision, it would not necessarily follow that it is a public utility bringing it within the statutory definition of that term, unless it so acted; therefore, whether it is or is not a public utility depends upon what it does and not upon the powers conferred upon it by charter. The contract above quoted is not a contract with the public, but is one entered into with a municipal corporation in its proprietary capacity. The municipality was responsible for its acts in connection with the supplying of this commodity to its citizens. That a municipality may generate, sell and distribute electrical energy to its inhabitants without submitting itself to the control of the Public Utilities Commission cannot be questioned. The town residents or consumers could lay no

complaint against Moffat Coal Company under the contract. They, by their votes, had determined that their representatives, the town officials, could construct a distributing system. They had the right to expect that electrical energy would be supplied to them by such officials at a reasonable rate and if dissatisfied, the power was theirs to change the condition.

It is clear that Moffat Coal Company was not operating for the purpose of supplying electrical energy to the public. It is equally clear that it was operating as a coal mining company and as such had not been declared by law to be "affected with a public interest." As a coal mining company, it did not fall within the definition contained in the public utilities statute and therefore could not be declared to be a public utility except by legislative action. There is no distinction between a sale by the company to the municipality, in its proprietary capacity, of its surplus energy, and a sale of the same to a private enterprise. The contract provides for one sale, of one commodity, to one customer, and not for a sale to the public or the inhabitants of the particular community at large. The company had no control and no concern as to the disposition or distribution of the electricity sold, nor the charges made therefor. It had contracted with the town to furnish this product at a stated fixed price. It had a right to so condition its contract that it would receive payment for its excess product, and in so doing it did not participate in the fixing of rates to be charged to the consumer. In a legal sense, it had contracted with a business enterprise, the contract being one between two corporations. What Moffat Coal Company did with its other electrical energy, or what the municipality did with the electrical energy it purchased, in no way affected the relationship of the two corporations under the contract. The supplying to the public of electricity furnished under this contract was a matter solely under the control of the municipal corporation, and over which the Public Utilities Commission had no jurisdiction. Whether receiving

electrical energy under this contract or not, neither the public nor any part of it, could demand such service from Moffat Coal Company by right, as it could do if the company was a public utility within the meaning of the act, and holding itself out as such, ready and willing to contract for such service.

As to what effect a finding that Moffat Coal Company is a public utility, and subject to regulation as such, would have upon the municipality is beside the question and needs no discussion here. Having determined that the company is not a public utility by reason of its amended charter or by virtue of its contract with the municipality, we leave the latter to the benefits or disadvantages, as the case may be, of the contract it has chosen to make.

Judgment affirmed.

MR. JUSTICE HILLIARD and MR. JUSTICE BOUCK dissent.

MR. JUSTICE BOUCK, dissenting.

I dissent from the denial of the petition for rehearing.

It is my conviction that the present majority opinion is consistent neither with reason nor with authority. Time has not permitted my preparing a comprehensive dissenting opinion herein. The original opinion, which was automatically withdrawn by the granting of a rehearing, fully expressed my views. I therefore content myself with quoting the withdrawn opinion, not as a pronouncement of this court now in force, for it has ceased to be such; but as an argument based upon the record and showing the fallacy of the majority opinion now on file:

"The plaintiff in error, Colorado Utilities Corporation, brought about by an informal complaint—and later intervened in—a proceeding before the Public Utilities Commission having for its purpose the determination of the question whether, under our public utilities act, Moffat Coal Company is a public utility and as such required to obtain from the commission a certificate of convenience and necessity before supplying electric current

under a certain contract with the town of Oak Creek in Routt county, Colorado. The commission ruled that the company is not a public utility and dismissed the proceeding. An action having been instituted by the intervening corporation in the district court for the purpose of reviewing and reversing the ruling of the commission, that court affirmed the latter and the intervener thereupon instituted these proceedings in error.

"Oak Creek is an incorporated town. It possesses and exercises all municipal powers conferred upon incorporated towns by statute. It does not operate a municipal electric generating plant. Light and power for the town's own use and for the use of its inhabitants must, under existing conditions, be procured from other agencies. Until July 1, 1931, the plaintiff in error Colorado Utilities Corporation—a public utility duly authorized by its charter and by the Public Utilities Commission to produce and sell electric current—supplied the town and its inhabitants with that commodity under a franchise granted by the town, which franchise expired at the time above mentioned. For some reason or other, the town declined to renew or extend the franchise. Instead, it proceeded to and did obtain the authority of its electors to construct electric transmission and distributing systems. * * *

"In view of the fact that it would possess only transmission and distributing systems without owning a generating plant, the town on October 15, 1932, entered into a formal contract with the defendant in error, Moffat Coal Company, which contract, because of its supreme importance in the case, we quote in full: [Here was quoted the contract which is set out in the majority opinion and is found at page 194, ante.]

"As stated at the outset, the Public Utilities Commission upheld Moffat Coal Company's contention that under the above contract the company is not a public utility.

"Section 2913, Compiled Laws of Colorado, 1921, defines public utilities as follows: 'The term "public utility," when used in this act, includes every common carrier, pipe line corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, person or municipality operating for the purpose of supplying the public for domestic, mechanical or public uses, and every corporation, or person now or hereafter declared by law to be affected with a public interest, and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction, control and regulation of the commission and to the provisions of this act; *Provided,* That nothing in this act shall be construed to apply to irrigation systems, the chief or principal business of which is to supply water for the purpose of irrigation.'

"It is apparent that Moffat Coal Company qualified itself potentially as a public utility by providing in its charter, through a formal amendment of its articles of incorporation in 1908, that its corporate 'objects * * * are * * * to construct and establish a plant or plants with all necessary equipment, rights and privileges for the manufacture and production of electricity, and to use, furnish, sell and supply the same.'

"By the contract hereinabove quoted, the company has brought itself within the letter—and we think within the spirit—of that part of the statute which says ' "public utility" includes * * * every * * * electric corporation * * * operating for the purpose of supplying the public for domestic, mechanical or public uses'; for it seems clear that the town's purchase of current for street lights and other municipal purposes is for public uses within the reasonable meaning of the language quoted. Such an arrangement to sell for 'public uses' is of itself sufficient to constitute the seller a public utility. Moreover, where, as here, the chief purpose of a contract is manifestly to supply the inhabitants of the town, who are ultimate consumers, with the necessary

current for domestic and mechanical uses, it seems to us, when we penetrate the form and get at the substance, that the execution of such a purpose is nothing more or less than supplying the public also for such 'domestic' and 'mechanical' uses, as fully as if the company's private agents were performing the distribution. A process similar to the one here agreed upon, but with another private corporation constituting the agency, was condemned in *Southern Oklahoma Power Co. v. Corporation Commission*, 96 Okla. 53, 220 Pac. 370. It is no answer to the question before us to say that the company's sale is to the town as a single individual customer only. The doctrine of cases like *State ex rel. Pub. S. Com. v. Spokane & I. E. R. Co.*, 89 Wash. 599, 154 Pac. 1110, cited by the defendants in error, has no application to this situation. A municipality can indeed acquire and operate a municipal plant, and so bring itself within the principle laid down in such cases as *Holyoke v. Smith*, 75 Colo. 286, 226 Pac. 158, and *Lamar v. Wiley*, 80 Colo. 18, 248 Pac. 1009, thus taking over the rate-fixing power and placing itself beyond the control of the Public Utilities Commission. The municipality cannot, however, refrain from municipal production of electric current and become in effect the mere distributing agent of a private electric corporation in the sale of current to its inhabitants where such current is produced entirely by the private corporation and is supplied by the latter to the municipality at an agreed price, the private corporation expressly fixing a minimum rate by stipulation that the current shall be resold at the same or a greater price. Compare *Davis v. People ex rel.*, 79 Colo. 642, 247 Pac. 801, and *Acquackanonk Water Co. v. Board of Public Utility Com'rs*, 97 N. J. L. 366, 118 Atl. 535. The evils aimed at by regulatory statutes governing public utilities would, if this procedure were judicially sanctioned, be placed beyond the control which the legislature intended to, and in our opinion did, establish.

"True, the company did not intend to convert itself

into a public utility. It expressly stipulated that it shall not be so considered. Such an expressed intention, however, does not effectuate the stipulation in the face of a contrary result inevitably following the interpretation and liabilities which the law places upon the concrete facts. *Davis v. People ex rel., supra.* These facts, and not the attempted avoidance, must govern.

"The various qualifications and reservations in the contract, whereby the company retains the ostensible power of withholding all or some of the current contracted for, do not deprive or relieve the company of its character as a public utility. So far as now appears, the maximum extent of supply agreed upon might continue undiminished for the period of twenty years without any interference with the amount of current needed by the town for the named purposes of itself and its inhabitants. Since the contract fixes the price to be paid by the town and the price to be charged the town's inhabitants is, by the contract, required to be as great or even greater, it is plain that the whole arrangement is alien to the notion of having the rates for the inhabitants subjected to any regulation whatever. It is not consistent with the fundamental idea that the ultimate consumer shall have within his reach a recognized method of procuring an impartial hearing and decision of the issue as to whether the rates charged are reasonable or not. By the very contract it has made, the town has abdicated as the lawful arbiter of that issue. Under the facts and circumstances of this case, such a consequence cannot be permitted unless the private corporation is itself placed under regulation as a public utility for the protection of the consumer.

"We hold, therefore, that Moffat Coal Company becomes a public utility whenever it does the things it has by its contract agreed to do, and as such it will be subject to the public utilities statute. Since it is clear that it intends to carry out the contract, it was incumbent upon it to procure first a certificate of convenience and necessity, as contended by the intervening Colorado Utilities

Corporation. By deciding that Moffat Coal Company is not a public utility and is not under the regulatory jurisdiction, the Public Utilities Commission 'erred as a matter of law'; its decision is 'not supported by any substantial testimony,' nor 'in accordance with the evidence,' and 'when tested by the uncontradicted testimony, it is unjust and unreasonable.' *Denver Co. v. Chicago Co.,* 64 Colo. 229, 262, 171 Pac. 74, 85.

"In declining to reverse the commission, the district court committed prejudicial error. For the reasons stated the judgment of the district court is reversed and that court will order the Public Utilities Commission to set aside its decision and to exercise its authority as such commission in relation to Moffat Coal Company with a view to a hearing on the issue of whether a certificate of convenience and necessity should or should not be granted."

The contract here involved spells, as I view it, nothing more or less than *a twenty-year contract for public utility services to be rendered to the public of Oak Creek.* But Mr. Justice Holland's opinion manifestly means (1) that any ultimate consumer in Oak Creek who hereafter might have a bona fide grievance as to electrical rates or service could obtain no redress against the Moffat Coal Company because, according to that opinion, this company is not a public utility corporation, (2) that such a consumer could obtain no redress against the town of Oak Creek, since by contract the town has voluntarily tied its own hands for two whole decades, so as to abdicate the power of regulation which in the absence of such self-imposed contractual restrictions it might possess, and (3) that the situation created by the decision constitutes the unjustified judicial repeal of regulatory legislation obviously intended by the General Assembly to govern exactly such cases as the one before us. I must respectfully decline to have a part in bringing about such untoward consequences as these.