THE PEOPLE'S TELEPHONE EXCHANGE, A CORPORATION, v. THE PUBLIC SERVICE COMMISSION OF MISSOURI AND THE HANAMO TELEPHONE COMPANY, A CORPORATION.—186 S. W. (2d) 531.

Kansas City Court of Appeals. March 5, 1945.

*John P. Randolph, Lester G. Seacat, R. W. Hedrick* and *Ellis G. Cook,* for appellant.

*Emmett Bartram, Gregory Stockard,* and *C. B. DuBois* for respondent.

CAVE, J.—This is an appeal by the Public Service Commission and the Hanamo Telephone Company, a corporation, of Maryville, Missouri, from a judgment of the Circuit Court of Daviess County, reversing an order of the commission refusing to grant a certificate of convenience and necessity to the respondent the People Telephone Exchange, a corporation, for the operation of its telephone system in Maryville and vicinity.

The case was instituted by the Peoples Telephone Exchange first filing an application asking the Public Service Commission to assume jurisdiction of applicant because it ". . . proposes in the future to furnish telephone service for a consideration to the public." Thereafter, it filed an amended application in proper form asking the commission to ". . . issue an order granting to it a certificate of convenience and necessity to operate for the use of the public for a consideration its telephone system and properties." The Hanamo Company, a Missouri corporation engaged in the telephone business at Maryville as a public utility, filed a motion to intervene in the proceedings before the commission, which motion was allowed, and it filed its written protest.

A hearing was had and the matter taken under advisement. Thereafter, the commission issued its report and order, by a majority vote of three to two, in which it denied the application for a certificate of convenience and necessity. The Peoples Telephone Exchange prosecuted a *certiorari* proceedings in the Circuit Court of Nodaway County and, on application for change of venue, the cause was transferred to Daviess County, where it was submitted to the court on the record and evidence before the commission. The court found that the action of the commission was *unlawful* and *unreasonable* and reversed and remanded the cause for further action by the commission. From this judgment the commission and the Hanamo Company appeal.

Appellants charge the trial court erred in holding that the action of the commission was unreasonable and unlawful for certain reasons which will be discussed. The respondent takes a contrary view and assigns certain reasons in support of the court's action.

The majority report and order denying the application was concurred in by three members of the commission; a dissenting report was filed and concurred in by the other two members, holding that the application should be granted.

The evidence discloses that the Hanamo Company was incorporated in 1897 for the purpose of providing telephone service for the people of Maryville and vicinity, and had been in continuous operation since that time. When the Public Service Commission law was enacted in 1913 the Hanamo Company, as a telephone company within the meaning of the act, came under regulation of the commission by operation of that law, and has complied with all rules, regulations and requirements of the commission and kept on file

with the commission its rates, schedules, tariffs and such other information and data as required. During all the years it has offered two types of rural service; one contemplates that the subscribers living beyond the city limits of Maryville will furnish and maintain the physical facilities to a connection with its lines at the city limits; the other *rural* service contemplates that the company will install, own and maintain the lines and equipment used in such service. The only restriction is there must be a minimum of 5 and a maximum of 10 on each rural line. The charges depend upon which service the subscribers select. The plans offered for rural service are in the manner and form as generally adopted by the telephone industry and as approved by the Missouri Public Service Commission. The Hanamo Company denies it has ever refused to render such service pursuant to its approved rules and regulations. It has about 980 subscribers in the city of Maryville and less than 25 rural subscribers. Its president, and principal owner, estimated the value of its property at approximately $120,000 and its gross income for 1941 slightly in excess of $38,000. The rates charged by the company have been approved by the commission and we deem it unnecessary to set them out. So much for a general outline of the status of the Hanamo Company.

What of respondent, the Peoples Telephone Exchange? The record discloses that in about 1901 a number of farmers of Nodaway County agreed to construct a telephone line into Maryville for their personal use. Before this line was completed some 8 or 10 other similar mutual organizations agreed to construct lines from their neighborhoods into Maryville, which was done. They undertook to get telephone connections with the Hanamo Company but could not agree on the charges to be paid, so the mutual lines installed their own switchboard. The system continued to expand until 1941, at which time it had 58 rural lines coming into its central office in Maryville. There were 370 *rural* subscribers and about 700 subscribers within the city of Maryville; about 250 of these were business phones and the remainder were in residences. These various mutual telephone lines formed some sort of a central governing body and adopted the name *Peoples Telephone Union*. It operated as a mutual company from its inception until 1941, at which time it was incorporated under the general corporation code, Article 5, Chapter 33, as *Peoples Telephone Exchange*. The members of the mutual company assigned all their interest and title in and to the lines, instruments, equipment, etc., to the new corporation and received stock of said corporation in exchange therefor. After applicant was incorporated it purchased a new switchboard, costing approximately $12,000, and having 20 circuits with capacity to accommodate about 2000 lines. It owns approximately 160 miles of poles, 250 miles of underground wire, 300 miles of overhead wire, 61,750 feet of cable and 82 miles of commercial wire, connecting its switchboard in Maryville with certain mutual exchanges

in other towns in that vicinity. Its investment is approximately $55,000 and its gross income for 1941 was slightly in excess of $19,000. Its *rural subscribers* have no telephone service except that furnished by applicant. There is no connection between applicant's telephone system and the Hanamo system, consequently some 300 or 400 of applicant's subscribers have had installed a telephone with each company. Applicant has no long distance service and if a long distance call is placed for one of applicant's subscribers who does not also have a Hanamo telephone, a messenger must be sent or word gotten to the subscriber by some method who must then go to a telephone owned by the Hanamo Company in order to receive the long distance call. Applicant's witnesses testified that the only deficiency in its telephone service *was the lack of long distance connections.*

In addition to applicant's own system, it has a working agreement with other mutual telephone organizations in Nodaway and adjoining counties for free service through the various exchanges.

The service rendered by the Mutual Company *to its subscribers* has always been reasonably satisfactory, and has improved since it incorporated and purchased the new switchboard. So far as this record discloses the service rendered by the Hanamo Company *to its subscribers* has been and is satisfactory. In other words, both companies are rendering reasonable service to *its subscribers*, but no provision is made or agreement reached to give the subscribers of one company the right and privilege of using the telephone system of the other, either for local or long distance calls. Therefore, the principal complaint is that the Hanamo Company would not make connections with the Mutual Company or the present corporation thereby giving to its subscribers the benefit of long distance service and, also, the privilege of telephoning any subscriber of the Hanamo Company. For this reason it is charged the Hanamo Company was not and is not rendering proper, adequate and sufficient service for the citizens of Maryville and Nodaway County.

It is clear from the record that in the early days of the rural telephone, the Mutual Company very largely organized and served the rural demands of Nodaway County, and that the Hanamo Company rendered very little, if any, service to such subscribers. It is intimated the management of Hanamo had never made much effort to secure rural subscribers; but it is also evident that the rural subscribers did not seek the services of the Hanamo Company but preferred their mutual system. Prior to the hearing before the commission an effort was made to reach an agreement between the conflicting interests for consolidation or sale of the properties, but nothing was accomplished.

The question presented is whether the order and report of the commission, as expressed by the majority, is, under the evidence, reasonable and lawful. Since the decision of the Supreme Court in

State ex rel. Railroad Co. v. Public Service Commission, 330 Mo. 729, the circuit court nor the appellate court tries *de novo* a case on review of an order of the commission in the ordinary sense of that term. Neither court can modify the commission's finding nor make one of its own; the court's authority is limited to an affirmance or a reversal of the order of the commission. The orders of the commission are *prima facie* lawful and reasonable until found otherwise in a suit brought for that purpose; and the burden of proof is upon the party seeking to set aside such an order to show by clear and satisfactory evidence that the order is unreasonable or unlawful. [Secs. 5702-5703, R. S. Mo. 1939; State ex rel. v. Pub. Ser. Com., 76 S. W. (2d) 343, 350.]

The fundamental and underlying question in this case is whether there is a public necessity for another public utility telephone system in Nodaway County? In its brief applicant states ". . . it is a continuance of the prior Mutual Company, . . . that one of the main purposes in getting a certificate of convenience and necessity is to be able to eventually demand and obtain long distance service for its customers." The evidence is that the Hanamo Company, as such, does not have any long distance lines or service, but renders that service to its subscribers under a contract it has with Southwestern Bell Telephone Company, which has long distance lines or service into Maryville. The terms of that contract are not shown in the record and were not required to be produced by the commission.

So long as applicant remained a *mutual company* it was not subject to the control and supervision of the Public Service Commission; and neither it, nor the commission, could *compel* a physical connection with the Hanamo system. [State ex rel. Buffum Telephone Co. v. Public Service Commission, 199 (Mo.) 962; State ex rel. Lohman Mutual Telephone Co. v. Brown, 323 Mo. 818, 19 S. W. (2d) 1048; 14 Mo. P. S. C., 231 and 244.] However, any one of its rural lines, having not less than 5 nor more than 10 subscribers, could secure connections with the Hanamo Company under the terms and schedules filed with and approved by the Public Service Commission. The president of the Hanamo Company testified that it had always been ready, willing and able to render such service under such conditions, but that his company would not permit, and was not required to permit, the united lines of the Mutual Company or of the applicant to connect with the Hanamo Company, because it would be confiscatory of the Hanamo property for the reason that the Mutual Company and the applicant charged less for their telephone service than did the Hanamo Company.

In deciding the questions presented the majority report of the commission so clearly states the issues and conclusions to be drawn that we set out the pertinent part thereof:

"The Peoples Telephone Exchange does not show that the Hanamo Company is furnishing any telephone service that its members do not now have with the exception of long distance telephone service which the Hanamo Company has with the Southwestern Bell Telephone Company. *Its members can of course secure that service by coming to the office of the Hanamo Company or requesting telephone service of the Hanamo Company, which service would afford toll service.*

"Neither does the Peoples Telephone Exchange show that its subscribers or members will have any different service other than that they are now getting should a certificate of convenience and necessity be granted to it. So as we see it there can only be two motives on the part of the Peoples Telephone Exchange for a certificate of convenience and necessity. One being to operate as a regulated public utility for hire. That would be a duplication of the facilities and service now rendered, of course, by the Hanamo Company. The other motive would be that by securing a certificate of convenience and necessity the applicant has in mind that it could secure a toll connection either by an interconnection between its switchboard and the switchboard of the Hanamo Company or by a toll connection direct with the lines of the Southwestern Bell Telephone Company. That would not make available any service that is not now afforded in the City of Maryville under present conditions. Granting the applicant the desired authority would therefore only result in destructive competition between two systems from which one would ultimately emerge as the survivor to the great loss to the other and in the meantime the public would be put to the continued necessity of patronizing the two systems as it has done in the past. . . .

"The Commission realizes that the law does not vouchsafe a monopoly to the system which is already in the field, and it would not hesitate to favor the granting of identical authority to another to enter the same area if the application alleged and the proof should be that the one which had preempted the area should be unduly, unavoidably and persistently remiss or derelict in discharging the trust which it holds to afford the utility service. We cannot now after years of diligent regulation permit a company, which through its predecessor, mutual company, by the expediency of unregulated service, by its own method of operation and lessor rates, build itself to important size, and then come before the Commission and urge public convenience and necessity to the detriment and damage of the regulated utility, which down the path of years has been regulated and supervised under the Public Law and its property dedicated to public use, without showing that the public utility in the field has failed in the discharge of its duty as above outlined. Therefore applicant's petition is not strengthened by the fact that it is merely a continuation of a mutual cooperative system which has occupied the identical

area since 1902 because the Public Service Commission law has conferred no 'grandfather rights' upon mutual cooperative telephones existing when the law was passed and operating not for hire but for the free interchange or service with its members and other like systems as did applicant's predecessor. Such systems are entirely omitted from their regulation of this Commission whether organized and existing before or after the effective date of said law. Regulation is primarily in the interest of the public but to preserve and extend this boon to the people the utility so regulated must receive just and equitable treatment. The law operates for all, the public and the utility.

"This commission would be derelict in its duty if it did not follow the law and afford to such a company this right properly due it, and in this particular case it is so plainly evident that the two companies cannot survive as regulated utilities, for the result would be destructive competition and economic waste. Duplication of service would create a telephone burden upon the general public in the areas herein disclosed. The Commission is, of course, eager to afford to all of the areas adjacent to Maryville ample and complete telephone facilities. It is unthinkable that in this modern age of science and development anyone should not have available complete telephone service. Yet, when this lack of service is due to the election of subscribers themselves and not to any failure of the regulated utility, we cannot in good conscience permit these subscribers to obtain the service they desire by a method which would destroy an existing regulated company capable of rendering the desired service. This service the people desire is now available and has been since the promulgation of the Public Service Commission law in 1913. . . . As we have heretofore stated the service desired by the former members of the Peoples Telephone Union, who are now stockholders of the applicant, is now available by the protestant and the entire power of the State of Missouri is behind this Commission to enforce the obtaining of this service from the Hanamo Telephone Company to anyone desiring it. A careful study of the records of the Telephone Department of this Commission fails to disclose any complaint from a single subscriber to the effect that the Hanamo Company has refused or failed to comply with its rates, rules and regulations as filed with this Commission; and when filed with this Commission act as the law.

"Public convenience and necessity is not proven merely by the desire for other facilities. It must be clearly shown there is failure, breakdown, incompleteness or inadequacy in the existing regulated facilities in order to prove the public convenience and necessity requiring the issuance of another certificate. The fact that one does not desire to use present available service does not warrant placing in the field a competing utility. This could be a continuing process and a continuing destruction of all regulated utilities and regulation.

Public convenience and necessity requires the availability of service and when that exists and is complete and reasonable and pursuant to law, the regulatory body has a duty to preserve it for public use.

"The remedy for the lack of service as described in the application and record herein lies in the hands of the people owning this applicant company. There is nothing to prevent the applicant from reverting to the same status as its predecessor and carrying on a mutual system at low cost to reach the rural areas surrounding Maryville or for these same people owning their own lines to elect to receive service from the protestant, Hanamo Telephone Company, in the manner as provided for in the rules and regulations as filed with the Public Service Commission by the said Hanamo Telephone Company. To refuse to sustain this application we take nothing from the applicant which it now possesses. . . ."

We are of the opinion that the report and order of the majority of the commission is supported by substantial evidence and, under all the facts and circumstances, is reasonable and lawful. We need not lengthen the opinion by enlarging or further commenting upon the reasons assigned in the majority report.

The minority report is based upon two theories. The first is that the commission has no jurisdiction *to grant or deny* a certificate to the applicant because "the applicant lawfully derived its title to the telephone properties which it now operates and proposes to operate in the future from an ownership which could lawfully operate those properties without proof of convenience and necessity and the statute makes no provision for the issuance by us of such a certificate under these circumstances, it follows that the applicant should be free to operate its property as a telephone utility without a certificate of convenience and necessity so long as it conforms to and abides by laws, rules and regulations in such case made and provided." This conclusion is based on a construction of Section 5673 on the theory that any telephone company which was in operation prior to the passage of the Public Service Commission law in 1913 was not required to apply for and receive a certificate of convenience and necessity, and since the Mutual Association was in existence prior to that date, it had certain rights as well as properties which it could lawfully sell to the applicant. The fallacy of that reasoning is that the Mutual Association was not subject to the act, acquired no rights under it and, therefore, had nothing to sell but its physical properties. By the purchase, or conversion to a corporation, the applicant acquired no more than what the Mutual Company had a right to sell, and when the applicant desired, and undertook, to extend its activities and services into the field of a public utility, it must prove that there existed a public necessity for such service in the area it proposed to serve; and since that area was already being served by a public telephone utility, it was necessary for applicant to prove that the service of that utility was

not reasonably adequate and satisfactory. We think it failed to meet these requirements.

The mere conversion from a *Mutual Association* to a *corporation* is of no great importance. The thing of importance is a conversion from a *purely Mutual Company or association* to a corporation or association offering *telephone service to the public for hire*. Section 5579-subsection 17, Revised Statutes Missouri 1939. In the Lohman case, *supra,* the Supreme Court held that whether a mutual telephone company is a public utility, and therefore subject to the jurisdiction of the commission, "is to be determined from what it does." It is conceded that applicant's predecessor had always operated as a mutual company until the conversion to a corporation, therefore we need not discuss or decide whether it was a mutual organization.

It is true Section 5673 provides that "no . . . telephone corporation hereafter formed shall begin construction of its . . . telephone line without first obtaining the permission and approval of the commission and its certificate of public convenience and necessity, . . . " but subsection 17, of Section 5578, *supra,* defines what is included in the term "telephone corporations" and states that it includes . . . every corporation, company, association, joint stock company or association, partnership and person, . . . owning, operating, controlling or managing any telephone line or part of telephone line used in the conduct of the business of affording telephone communications *for hire."* (Italics ours.) Therefore, so long as the applicant or its predecessor conducted its business for its subscribers alone, it was not subject to the jurisdiction of the commission, and acquired no vested rights under that law; but when it declared its purpose ". . . to operate for the use of the public for a consideration . . . " it became or sought to become a public utility, subject to the jurisdiction of the commission, and must secure a permit of convenience and necessity if it continues as such.

The second reason assigned by the minority report is that the subscribers of applicant do not now have, and have been unable to secure, long distance connections; and that this is one of the main purposes of applicant in obtaining its certificate of convenience and necessity. The report holds that "to deny the application would deprive these subscribers of a very essential and necessary telephone service unless they elected to obtain service according to protestant's schedules on file with the commission." If protestant's schedules on file with the commission are unfair and unreasonable, then the commission should exercise its very great powers and authority, under Article 5, Chapter 35, to correct such a situation. But it also follows that if such service is available on fair and reasonable conditions which have been approved by the commission, then there is no public necessity for another telephone utility in that area.

Applicant also urges that if a certificate of convenience and necessity is denied it will result in depriving it of valuable property without just compensation, in violation of Article II, Section 3, of the Constitution of Missouri, and Section 1, Amendment 14, Constitution of the United States. This contention is based on the argument that the Mutual Company owned certain property which it had a lawful right to sell and that applicant had a lawful right to purchase, and that when it purchased such properties it had a right to continue to operate that which had been lawfully acquired. No one questions the right of the *Mutual Company* to sell its property to the applicant without the approval of the commission, (Because it was not subject to the commission law), and the right of the purchaser (applicant) to purchase it and to continue to operate the properties as theretofore operated. But the issue before the commission and before the circuit court and this court is whether the applicant is entitled to abandon the former operation of the property and enter into a new field of service as a *public utility*. As heretofore pointed out, the denial of the application takes nothing from the applicant which it secured by the purchase.

Applicant admits that the commission can prevent the spread of competition by denying certificates to new enterprises, but argues that it has no authority or procedure whereby it can lawfully eliminate lawful competition which has become lawfully established in an area. That is the express holding of the Supreme Court in State ex rel. City of Sikeston v. Public Service Commission, 82 S. W. (2d) 105. In that case the city had voted bonds to construct, and had constructed, a municipal light plant which was being operated in competition with a public utility rendering the same service. The city sought to have the commission revoke the license of the public utility because there was no further need for its services. The court held that the commission had no such authority. The commission nor the court was considering or deciding the question of whether a certificate of convenience and necessity should be issued to a new and competing *public utility*. The City of Sikeston was in the same position as the Mutual Company is in this case in that neither was subject to the jurisdiction and control of the commission and, therefore, required no authority from the commission to begin or to continue to operate. They were not in competition as *public utilities*. In deciding that case the Court reviews the authorities and announces certain general purposes of our commission law, and we quote parts which are particularly applicable to the issues presented here, 110:

"The Public Service Commission Law was intended to prevent overcrowding of the field in any city or area and thus 'restrain cutthroat competition upon the theory that it is destructive, and that the ultimate result is that the public must pay for that destruction.' State ex rel. Union Electric Light & Power Co. v. Public Service Com-

mission, 333 Mo. 426, 62 S. W. (2d) 742, 745. To accomplish this the commission was given the authority to pass upon the question of the public necessity and convenience for any new or additional company to begin business anywhere in the state, or for an established company to enter new territory. To secure to the public all advantages to be gained from competition in obtaining fair rates and good service and also to protect them from its disadvantages, the commission was given authority to regulate rates, to investigate complaints about service, to compel companies to adequately serve all persons and industries in the territory in which they operate, to order improvement and safety equipment, and to authorize the abandonment or extension of lines and the financing of all improvements or purchases. *The question of whether regulated monopoly or regulated competition will best serve the public convenience and necessity in a particular area at any time is for the commission to decide, subject to the qualification that the commission must not act arbitrarily or unreasonably, which matter is reserved to be passed upon by the courts.* State ex rel. Electric Co. v. Atkinson, 275 Mo. 325, 204 S. W. 897.'' (Italics ours.)

We conclude the commission did not act arbitrarily or unreasonably in denying the certificate.

It follows that the judgment of the circuit court must be reversed and the cause remanded with directions to affirm the majority report and order of the Commission. It is so ordered. All concur.