No. 18,698.

PUBLIC SERVICE COMPANY OF COLORADO *v.* THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO, ET AL.
(350 P. (2d) 543)

Decided March 14, 1960.   Rehearing denied April 11, 1960.

Messrs. LEE, BRYANS, KELLY & STANSFIELD, Mr. BRYANT O'DONNELL, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. HENRY E. ZARLENGO, Assistant, for defendant in error Public Utilities Commission of Colorado.

Messrs. GRANT, SHAFROTH, TOLL, CHILSON & McHENDRIE, Mr. ERL H. ELLIS, for defendant in error Union Rural Electric Association, Inc.

Messrs. ALLEN, LYNCH & ROUSE, for defendant in error Colorado Central Power Company.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

ON June 30, 1955, Union Rural Electric Association, Inc., a Colorado nonprofit co-operative corporation, herein referred to as "Union," filed with the Public Utilities Commission of the state of Colorado, herein referred to as "PUC":

1. Its application for (a) a certificate of public convenience and necessity to serve with electrical energy an area *around* Brighton, Colorado; (b) for clarification and ratification of its existing rights to serve such area and for extension of service in such area; and

2. Its *complaint* against the Public Service Company of Colorado, herein referred to as "Public Service," wherein Union complains to PUC of alleged unauthorized invasion by Public Service of Union's service area and other alleged illegal acts of Public Service.

On September 22, 1955, Public Service filed its *answer* to Union's *complaint*, urging dismissal thereof, and on the same day filed its *protest* to Union's *application*, urging dismissal thereof. Colorado Central Power Com-

pany, herein referred to as "Central," filed its *protest* to Union's *application*, urging dismissal thereof. Neither Public Service nor Central requested affirmative relief.

Prior to taking testimony, PUC divided Union's application into two parts: "Application No. 13576," being Union's request for authority and clarifications, and Case No. 5108, being Union's complaint against Public Service. Application No. 13576 and Case No. 5108 were consolidated for the purpose of taking evidence. Hearings consumed seventeen days, and spread over the period from September 27, 1955, to September 5, 1956. The testimony consists of over 1500 pages. There are nearly one hundred exhibits. PUC took the matter under advisement and on January 7, 1957, two members of PUC made thirty-three pages of findings, conclusions of law, and entered its order, Decision No. 47074. The third member filed a dissent.

All parties filed petitions for rehearing, pointing out alleged gross errors of PUC in resolving questions contrary to their respective interests and contentions. These petitions were all denied.

The matter was presented to the district court for review by certiorari, each party seeking reversal of some portion of PUC's orders. The district court affirmed Decision No. 47074 in all respects. All parties are here by writs of error, each seeking reversal of some part of the judgment of the district court. We are favored with nine different, carefully prepared briefs, voluminous, exhaustive and exhausting.

There is little, if any, conflict in the testimony, and none on essential facts.

Public Service and Central and their predecessors in interest had for many years prior to 1936 (the year the Rural Electrification Administration, hereinafter referred to as REA, was created), been engaged as regulated utilities in supplying among other services, electric service to Denver and to various points in Boulder, Gilpin, Jefferson and Adams Counties (these counties

include the area involved herein), which service Public Service and Central claim was rendered in conformity with numerous certificates of public convenience and necessity issued by PUC and the general provisions of the utility laws of the state of Colorado.

Public Service and Central had filed with and had approved by PUC rates for various services rendered and to be rendered in the area involved herein; also charges and terms for extending their facilities to any prospective consumers in said area. Public Service and Central have invested millions of dollars in erecting facilities in the area and to render service therein, all with the sanction and approval of PUC, and have at all times had ample power and facilities to serve the area and have at all times prepared in advance with additional power and facilities adequate to meet any reasonably anticipated increased demands for service in the area.

The record discloses the fact that prior to 1936 large sections of the area and numerous rural residents therein were not being supplied with electricity, the principal reason therefor being the costs of wiring their premises and costs of extending lines into thinly populated areas, which costs had to be paid by the consumers. One reason the costs then appeared prohibitive was the prevailing low incomes of rural residents.

With this background in mind, we find that on May 20, 1936, Congress created the Rural Electrification Administration, an agency of the Department of Agriculture (Title VII ,USCA 901-915):

" * * * for the purpose of financing the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy *to persons in rural areas who are not receiving central station* service * * * ." (Emphasis supplied.)

Throughout the act we find wording which clearly sets forth that the underlying purpose of the act was to

make electrical energy available to persons living in rural areas to whom electric energy was not available from central stations of public utility companies.

In 1938, a number of persons living in the area in question formed Union, a nonprofit co-operative corporation, for the purpose of furnishing electric energy to unserved persons in the area and to take advantage of the various subsidies made available by REA. With money, all borrowed from REA, Union constructed a substation and distribution lines, and with power purchased from Public Service, pursuant to contract, commenced serving rural area persons in 1940. Union's certificate of incorporation expressly stated in Article 2 that:

" * * * the object or objects and purpose or purposes for which the corporation is formed are: (a) to generate * * * electric energy *for its members only* and to transmit and distribute * * * such electric energy *to its members only* * * *; (c) to assist its members to wire their premises * * *; (f) to do and perform either for itself *or its members* * * *. *The Corporation shall render no service to or for the public.*" (Emphasis supplied.)

The original by-laws of Union clearly state that Union will serve *its members only, that it will not serve the public.* Acceptance by Union of an application for membership and issuance of a membership certificate constituted a contract between Union and the member. Terms of the articles of incorporation and the by-laws dealing with such matters as changes in rates, disposition of profits (which this nonprofit organization elects to call "net margins"), minimum monthly charges, the duty of members to purchase all electric energy used on their premises from Union, the lack of duty on the part of Union to supply all of the needs of its members, withdrawal and expulsion of members, accounting practices as designated by REA, ninety days' notice to REA of any proposed changes in rates — terms all of which are foreign to public utility status and operations — constituted

a part of the contracts existing between Union and its members and now remain as a part of Union's by-laws and its contracts with its members.

Union from its incorporation in 1938 until May 28, 1955, conducted its affairs pursuant to and in conformity with its articles of incorporation and by-laws, as above set forth; it offered to serve and served its members only. During this period Union repeatedly, and without exception, in court proceedings and proceedings before PUC, went on record as not being a public utility, and successfully questioned the jurisdiction of PUC to exercise any control over it or to regulate its activities in any manner.

In May of 1955, Union amended its articles of incorporation by deleting therefrom the statement: "The Corporation shall render no service to or for the public," and by altering its original avowed purpose to serve "members only" to read "members and customers." Similar changes were made in the by-laws. The total effect of the changes was to grant to Union charter and by-law authority to serve the public — none of the other restrictions and limitations placed on Union or its members, as outlined above, was lifted or altered.

Within a month after making these article and by-law changes, Union filed its complaint and application herein.

Union now unblushingly claims that it has been a public utility from the date of its first business in 1940. It asks to be judged on the basis of what it did, even though contrary to its charter, its by-laws, its loan agreements with REA and, if it were a public utility, in violation of the laws of the state of Colorado, rather than on the basis of what it was authorized to do by its articles and by-laws. It asks that this court ignore the so-called "charter test" and follow the so-called "factual test" in deciding its status during this period prior to amending its articles.

PUC in its opinion in dealing with this problem, in

disposing of Union's complaint against Public Service, said:

"Union argues that in deciding when its facilities became so devoted to public benefit as to warrant protection, notwithstanding that its charter prohibited it from serving the public, we should not limit our consideration to the charter, but should consider all the facts of its operation. To buttress its 'factual test,' it cites many authorities, including two Colorado Supreme Court decisions, which say, on this point, that the substance of the operation, and not the form of the charter, is controlling. In this case, however, the form and the substance are alike; Union did not at any time, at least before October 17, 1955, at the earliest, ever hold itself out publicly as being willing to serve the public, as distinguished from its members. Its claim that it served the public is not borne out by the evidence. Instances of its attitude and actual practice prior to 1955 are above referred to. In addition, its manager in this proceeding re-affirmed its practice. When Union changed its rate structure in 1950, it did not file its rates with the Commission 'as we were serving members only at that time.' "

Union's manager testified: "Q. Then you didn't hold yourself out to serve the public indiscriminately, did you? A. We held ourselves out to serve anyone who wanted service and who would become a member. Q. That was a condition, that they become a member? A. That is correct. Q. Did you serve any non-members at all at any time? A. None at all."

PUC further said:

"Counsel for Union says the same, but in a different way: 'Union has actively solicited all possible business in its area from the start and has made 'membership' a most simple and *almost* automatic procedure.' (Emphasis supplied.)

"The cooperative does not say that it held itself out as willing to serve the non-member public. Its claim

rests entirely upon the assertion that it never refused membership to anyone, although it concedes it could have. It will thus be seen that on a single set of facts, this cooperative, in 1948, claimed it was not a public utility, and now claims that it is. This does not relieve us of the burden of determining the truth of the matter; it does leave the co-operative in a rather poor position to deny that we are right. Our view is the same as that of our Supreme Court in the recent case of *Parrish et al, v. PUC*: [134 Colo. 192, 301 P. (2d) 343]

" 'The service to each customer is a permissive service, which creates the distinction between a public utility or a private carrier. The record discloses no dedication of the pipe line by Cobb to the public service, and, as was determined in the City of Englewood v. City and County of Denver, supra [123 Colo. 290, 229 P. (2d) 667], this can never be presumed, but must be supported by evidence of an unequivocal intention to make such a dedication . . . We have no testimony to the effect that Cobb ever made any semblance of an offer to serve the public. The fact that he testified that he never refused a tap to anyone does not change his status.'

"Nor do we believe that the act of changing the charter changed Union's status. This was a private act, taken within the corporation. At most, it only authorized the corporation to serve the public; it did not require such service. It did not amount to a dedication of its property to the service of the public. In *Colorado Utilities Corporation v. P.U.C., et al*, [99 Colo. 189, 61 P. (2d) 819], it was sought to compel a coal company which sold, on a dump basis only, any excess power it generated, to serve as a public utility. Our Supreme Court, in finding that the Respondent could not be compelled to serve as a public utility, said:

" 'Moffat Coal Company, under its amended charter, had the power to generate and sell electrical energy, but by such charter it did not have express power to do so as a public utility. However, had its charter contained

such express provision, it would not necessarily follow that it is a public utility bringing it within the statutory definition of that term, unless it so acted';

"In the present case, authority to serve the public prior to the 1955 amendment of its charter, could not even be implied; it was expressly prohibited. There is no evidence that Union took any action between the date its charter was amended and the date the application was filed, to indicate publicly a willingness to serve the public. Even the carefully worded application, filed June 30, 1955, says only that the cooperative 'can now render service to a customer who does not desire to become a member;' nowhere does it say that the cooperative is willing to serve such a customer. It was not serving any on October 17, 1955; the first evidence of serving such a customer was as of February 16, 1956. There being no evidence of a declaration or other public holding out to serve, we must rely on the fact of serving as evidence of the intention. We conclude that the first occasion upon which the cooperative held itself out to the public as being willing to serve the public occurred sometime between October 17, 1955 and February 16, 1956. This holding out, of course, goes simply to show one of the requirements for utility status: intention and willingness to serve. This qualification, standing alone, is not sufficient to endow a company with the protection of statute, as is noted below.

"It is argued elsewhere that the cooperative cannot become a utility, as illegal operations do not justify the granting of a certificate. Our conclusion is that the cooperative did not operate illegally as a utility; it did not operate as a utility at all, until recent date."

We concur in the conclusion of PUC that Union, at the time it filed its complaint and application herein (June 30, 1955), had not been and was not then a public utility as defined in and contemplated by the statutes of the state of Colorado, C.R.S. '53, 115-1-3, concerning public utilities.

This conclusion finds ample support in the evidence presented and the following decisions of this court: *Colorado Corp. v. Utilities Com.*, 99 Colo. 189, 61 P. (2d) 849; *City of Englewood v. Denver*, 123 Colo. 290, 229 P. (2d) 667, and *Parrish v. PUC*, 134 Colo. 192, 301 P. (2d) 343.

In view of the fact that Union had not, at the time it filed its complaint against Public Service, acquired public utility status, it was in no position to complain that Public Service was invading its service area, for, not being a public utility, it had no service area.

That portion of PUC order and that part of the district court judgment holding that Union had no public utility status at the time it filed its complaint and dismissing Union's complaint against Public Service in Case No. 5108 is correct and is affirmed.

We now turn to Union's application for a certificate of public convenience and necessity and PUC's order granting the same.

PUC decided that Union had acquired public utility status sometime between October 17, 1955, and February 16, 1956. It stated that during that period of time arose " * * * the first occasion upon which the Co-operative (Union) held itself out to the public as being willing to serve the public * * *.

"We are *now* issuing Union a certificate; it thus becomes entitled to protection from here *forward*." (Emphasis supplied.)

In view of the fact that Union desires a certificate with its attendant protections and obligations, the further fact that from the record, briefs and arguments presented by Public Service and Central, it appears that neither objects to, but rather welcomes, the granting of such certificate to render service limited in scope, we find no reason for disturbing this ruling, though it does appear that Union is discriminating against *customers* and in favor of *members*, and its by-laws contain

many provisions, as outlined above, that are at variance with public utility operations and may well have to give way to proper regulatory orders of PUC. Now that Union is subject to regulation, such discrimination and other matters pointed out as being contrary to the basic concept of public utility operations can be corrected and eliminated by PUC under its regulatory powers, as set forth in C.R.S. '53, 115-3-2.

■ We approve of and affirm the action of PUC in granting to Union as of January 7, 1957, a certificate of public convenience and necessity only insofar as it grants to Union authority to render, as a regulated public utility, electric service to its then members and customers, save and except members and customers residing in incorporated towns and cities and in the boundaries of areas previously certificated to Public Service and Central, and to increase the volume of energy it delivers to any then connected member or customer. The PUC may well have concluded that proof of rendition of this service for a long period of time was sufficient proof of public convenience and necessity to warrant the issuance of a certificate to continue the service except for that portion ordered discontinued and the removal of facilities.

PUC directed Union *to remove its facilities* from (a) incorporated towns and cities *in the area;* (b) those portions of *the area* previously certificated to Public Service and Central or their predecessors in interest. Union contends that, even though it may not be entitled to serve in these areas, PUC had no authority to order removal of its facilities, and points out that at least a portion of the facilities ordered removed are an integral part of its electric system and necessary to render service to its present members and customers.

■ The legislature has granted to PUC very extensive and broad regulatory powers including the power to designate location of facilities and also relocation or removal thereof. C.R.S. '53, 115-4-2; 115-1-1; 115-5-3.

In exercising this power, as in the exercise of any other power granted to PUC, the interests of the public should always be given first and paramount consideration. We feel that the record does not disclose facts which warrant this broad order of removal. Public interest would best be served by an order directing discontinuance of service by Union in the specified areas and removal by Union from said areas of such of its facilities as in any way deter the certificated utilities serving such areas from rendering adequate economical and efficient service thereto.

Though hearings before PUC continued for a year and all parties were granted wide latitude in offering oral and documentary evidence in support of their respective contentions concerning the rights of the parties to make further extensions of facilities and services in *the area,* PUC made no complete or final determination of that question, but left the question unresolved and subject to piecemeal solution by requiring the interested parties to make application for authority to make specific extensions. PUC stated and held that:

"No showing of public convenience and necessity has been made, sufficient to warrant setting aside an exclusive service territory for Union * * *.

* * *

"We find that the cooperative has failed to show by its evidence that the public convenience and necessity require, or will require, that it be assigned an exclusive service territory; or indeed that the public would benefit at all from such an assignment."

Such holding is in harmony with the record before us; in harmony with all of the testimony heretofore referred to that the area was virtually 100% served; in harmony with the testimony of Union's manager that:

"I can state it this way: That every bit of our lines were in areas where there were utilities (Public Service or Central)."

It is in harmony with PUC's statement in granting Union public utility status that:

"If it (Union) would enter the field it must recognize that others (Public Service and Central) are already there; *it must find its place from among the places that remain.*" (Emphasis supplied.)

Clearly there were no "places that remain" at the time Union acquired public utility status.

Union contends that Public Service and Central had authority to serve only those areas certificated to them and within the boundaries as set forth in the certificates. Such contention is contrary to the statutes of the state of Colorado and the holdings of this court.

▪ Long prior to Union's birth, Public Service and Central were certificated public utilities rendering service in the area. They, in addition to the authority set forth in their certificates, had the statutory authority to extend their facilities:

" \* \* \* into territory, either within or without a city and county or city or town, contiguous to its facility or line, plant or system, and not theretofore served by a public utility of like character \* \* \* ."

C.R.S. '53, 115-5-1.

There can be no doubt that it was the policy of the legislature to make available, at reasonable rates, regulated utility services to the people of the state, and the only limitation placed on expansion into contiguous territory by a certificated utility is that it not expand into an area "theretofore served by a public utility of like character."

As pointed out above, at the time Union acquired public utility status, *the area* was already completely served by extensions made by Public Service and Central. Extensions made by Public Service and Central, during the time Union was serving members only and holding itself aloof from all control and regulation by PUC, were authorized by statute and valid — they were not extensions into an area "theretofore served by a

public utility of like character," for Union was not a public utility of any character.

In *Utilities Commission v. Loveland,* 87 Colo. 556, 289 Pac. 1090, this court said:

" * * * The record clearly shows, at least the Utilities Commission so found, and properly so we think, and the trial court so determined, that the field or territory which the city attempted to monopolize outside of its own municipal boundaries was just as contiguous to the pre-existing facilities of the Public Service Company as to those of the city. The Service Company was first in the field. The very object of the provisions of the statute applicable here was to prevent, in the interests of the general public, unnecessary duplication of facilities or systems for furnishing the same to customers. When the city became a public utility under the statute, it had no superior right as to territory outside of its municipal boundaries over the rights of any other public utility, private corporation or otherwise, authorized to furnish service."

In *South Suburban Motor Coach Co. v. Levin,* 269 Ill. App. 323, the court said:

"We think it was not the intention of the legislature to restrict complainant's field or territory to the precise and specific streets and highways named in the certificates. On the contrary, it would seem that necessarily such field or territory must extend to a reasonable distance on each side of its route and beyond its terminal points * * * .

\* \* \*

"We recognize the difficulty of determining by exact definition the meaning of the word 'field' or 'territory' as applied to operators of public utilities, but defendant does not claim to be a utility at all, and if he did so claim complainant as the first in the field should be given an opportunity to supply any needed service before any other is given the privilege of competing with it. *Egyptian Transportation System v. Louisville & N. R.*

*Co.*, 321 Ill. 580. Any other rule would make it possible to destroy the established utility which it is the very purpose of the act, as we understand it, to protect from destructive competition. *Chicago Rys. Co. v. Commerce Commission*, 336 Ill. 51."

The following language of the Court of Appeals of the state of Missouri is singularly applicable to the case at bar:

" ' * * * We cannot now after years of diligent regulation permit a company, which through its predecessor, mutual company, by the expediency of unregulated service, by its own method of operation and lesser rates, build itself to important size, and then come before the Commission and urge public convenience and necessity to the detriment and damage of the regulated utility, which down the path of years has been regulated and supervised under the Public Service Law and its property dedicated to public use, without showing that the public utility in the field has failed in the discharge of its duty as above outlined. * * *.'

\* \* \*

" * * * By the purchase, or conversion to a corporation, the applicant acquired no more than what the Mutual Company had a right to sell, *and when the applicant desired, and undertook, to extend its activities and services into the field of a public utility, it must prove that there existed a public necessity for such service in the area it proposed to serve; and since that area was already being served by a public telephone utility, it was necessary for applicant to prove that the service of that utility was not reasonably adequate and satisfactory. We think it failed to meet these requirements.*"

*Peoples Telephone Exchange v. Public Service Commission*, 239 Mo. App. 166, 186 S.W. (2d) 531.

The record before us shows, and without any contention by Union to the contrary, that Public Service and Central have for many years been ready, able and willing to render adequate regulated service to the residents

of the area. There is a complete absence of proof that any additional service is required or desirable.

In view of the above we must and do conclude that PUC, in ordering that:

"Public convenience and necessity require that Union be * * * authorized to distribute electricity nonexclusively in the uncertificated and unincorporated portions of the territory described in appendix A (the area)" arrived at a conclusion which is not in accordance with the evidence, but contrary thereto, contrary to its own findings as set forth above, and contrary to fundamental principles governing public utility operations. Public Service and Central having served *the area* long prior to Union's incorporation have at great expense acquired valuable rights to serve the area, all in conformity with law and with the approval of PUC, and PUC cannot deprive them of their rights nor curtail or limit them in exercising their rights to extend and expand their services in the area so long as such expansion does not impair or endanger service to others or other areas entitled to their service.

Public Service and Central should be permitted to extend their lines in the area in order that they may perform their duty to the public, utilize their property for the purposes to which it has for years been dedicated and without restrictions by PUC predicated on alleged rights of Union claimed by it to have been acquired during its operations prior to gaining public utility status.

As a necessary corollary to the above, PUC has no authority to grant to Union any rights of extension in the area except upon application and proof of the fact that adequate service is not readily available from Public Service or Central and that public convenience and necessity requires that Union render the service requested.

The judgment of the district court is affirmed in part and reversed in part, and remanded with directions to

refer the matter back to PUC for further proceedings and orders in conformity with the views herein expressed.

MR. CHIEF JUSTICE SUTTON, MR. JUSTICE DOYLE and MR. JUSTICE MOORE dissent.

Mr. Justice Doyle dissenting:

My disposition is to affirm the judgment of the district court, which judgment affirms the findings of the Commission. The only justified modification made by the majority is that which pertains to removal of lines in the Arvada area. In other respects the Commission's findings are most impressive. The Commission went to great lengths in its efforts to solve a most perplexing problem. It conducted hearings extending over a period of a year and its findings show a scrupulous adherence to the law and a conscientious effort to achieve a practical and equitable disposition of the issues. In view of this, the Court should not set aside well founded findings and well premised conclusions upon the simple basis of lack of sympathy for the cooperative arising from its having evolved as a federally sponsored instrumentality. Such an attitude is apparent in the majority opinion.

The part of the majority opinion with which I am in fundamental disagreement is the determination that the territory in question belongs to Public Service and that Union notwithstanding that it is now a recognized utility cannot further expand. This is contrary to the statute and contrary to the basic principles of utility regulation. In view of this ruling, the holding that Union did not acquire utility status until such time as the Commission recognized it must also be discussed.

*The determination that Union is entitled to a Certificate of Convenience and Necessity.*

Union contends that notwithstanding that it has operated as a cooperative since 1939 and notwithstanding

that it did not apply for a Certificate of Convenience and Necessity until June 30, 1955, that during all of the years of its operation it was in fact a public utility — that it built and extended its lines as a utility and that its facilities now occupy the areas which are here in question and that its recognition as a utility should relate back to 1940. The Commission found as a fact that Union had evolved to utility status but further found that Union's utility status should not be retroactive. The Commission noted, however, that prior to the development of Union "large sections of the area and numerous rural residents therein were not being supplied with electricity, the principal reason therefor being the cost of wiring their premises and cost of extensions in the thinly populated areas."

It is undisputed that Public Service did not during the period in question, from 1940 until 1955, seek to actually develop the rural portions of the Appendix A territory. To be sure, Public Service had lines in the county for the purpose of serving urban centers. Moreover, Public Service held itself out as willing to serve the entire area but it was Union that was to bring service to the farms of the area. Public Service takes the position that the whole of Colorado, with the exception of those parts not being served by other utilities, is contiguous to its territory. So the only difference between the Appendix A area and the other parts of the state is that in the former there are some lines. The Commission found this fact and pointed out the realities of the situation as follows:

"In the present case, each party claims it has been 'serving the territory' in which it operated. The effect of the statute, which is controlling, is discussed below. The statute aside, and from a public viewpoint, however, 'territory' is not served; only customers — people — are served. The Utilities, if they were serving the territory at the time Union developed and installed its lines, were doing so only in a technical sense. Doubtless, the eco-

nomic realities of the time made it difficult, if not impossible, for the utilities to serve everyone in the area. The fact is, however, that they did not serve everyone. If they had, Union could never come into existence; it would have found no one to serve. Union was nurtured on customers the utilities did not serve, and in the case of the Public Service area, this occurred with the existing utilities' failure to supply all of the needs of their territory, whatever the reason, has now come home to roost. The cooperative is a fait accompli; it is in existence, serving customers. The cooperative is there to stay so far as this Commission is concerned."

The evidence at the hearing established that the Union lines are much more prevalent than those of Public Service. The reason that the territory involved was so developed is conceded by the parties to be found in the economic circumstances of the times. Public Service could not bring its lines to the rural areas without prohibitive charges. Consequently there would have been no service in the Appendix A territory had it not been for the formation and development of Union. As indicated by the Commission, Public Service was not too concerned as long as the territory was essentially rural. Its concern developed only after the war and during the period of population influx and growth, at which time it became feasible for Public Service to expand into the Appendix A territory. It was only then that the conflict and competition developed.

As I view it, the refusal of the Commission to recognize Union's public utility status prior to October 17, 1955, is not too significant if the remainder of the Commission's decision to the effect that no one of the parties has exclusive rights in the territory is sustained. In view, however, of the majority determination that the Certificate is not really a Certificate, then the finding and conclusion of the Commission should receive careful scrutiny. It would appear that the determination of the Commission that the service rendered by Union was not

rendered as a public utility, is based entirely on formal aspects. It is said that Union served its members only, and this point is stressed notwithstanding the testimony that membership was never refused to anyone and notwithstanding the fact that Union entered this sparsely occupied area and brought electricity to some 3,000 outlets while Public Service stood by and merely expressed a readiness to serve. If the test of public utility character is in whether it has dedicated its property to the service of the public and has offered to serve it, it would seem that Union would be more entitled to public utility status in the specific areas than Public Service. Legal formalities are, of course, important in determining character. They should not, however, outweigh the actual facts. If it were shown that Union followed a restrictive policy in taking on new members there would be some substance to the argument, but when it is shown that any individual who desires utility service could become a member, the restrictive suggestion arising from the requirement of membership disappears. The decided cases have recognized that substance rather than form should govern this determination.

In *Davis v. People,* 79 Colo. 642, 247 Pac. 801 this Court affirmed a judgment of the district court enjoining Davis from operating a truck line without a Certificate of Convenience and Necessity. He purported to serve members only of an association. He had a contract binding him to haul for members only but he accepted shipments from non-members to members and from members to non-members. In holding that he was in fact operating as a utility and was thus subject to the law, this Court said:

"In determining whether a business is that of a common carrier 'the important thing is what it does, not what its charter says.' *Terminal Taxicab Co. v. Kutz, et al.,* 241 U.S. 252, 36 Sup. Ct. 583, 60 L.Ed. 984, Ann. Cas. 1916D, 765. A service may effect 'so considerable a fraction of the public that it is public in the same sense in which

any other may be called so * * *. The public does not mean everybody all the time.'

"Had defendant made all, save one, of the shippers of freight in that territory, or all purchasers of postage at any postoffice therein, members of the association, and claimed that such limitation converted an otherwise public into a private carrier, the contention would be so absurd as to be instantly rejected. But the reasons for that rejection would be the identical reasons which demand rejection of defendant's contention in the instant case: (a) The proportion of the public served is so large as to be the public; (b) the limitation is a mere device to hoodwink the law."

Decisions of the Commission which recognize "character of operation" rather than the form of the charter as the test of determining whether the subject was a proper utility are: *Baker v. Lake City L. & P. Co.,* 3 PUR (3d) 97, *City of Colorado Springs v. Colo. P.U.C.,* 86 PUR-NS 57. Cases from other states which support the so-called factual test are: *Industrial Gas Co. v. Public Utilities Commission,* 135 Ohio St. 408, 21 N.E. (2d) 166 and *Rural Electric Co. v. State Board of Equalization,* 57 Wyo. 451, 120 P. (2d) 741; *Arkansas-Louisiana Cooperative v. Arkansas Public Service Commission,* 210 Ark. 84, 194 S.W. (2d) 673; *Natural Gas Service Co. v. Surv-Yu Cooperative, Inc.,* 69 Ariz. 328, 213 P. (2d) 677, 70 Ariz. 235, 219 P. (2d) 324; (cited with approval *Davis v. People,* supra); *Bookhart v. Central Elec. P. Coop.* 219 S.C. 414, 65 S.E. (2d) 781; *Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board,* (9 Cir. 1954), 213 F. (2d) 814.

In the Wyoming case, cited above (*Rural Electric Company v. State Board of Equalization*), the Court used the following pertinent language:

"Of course, if the service is rendered pursuant to contract or limited membership, it is difficult to hold that one has expressly held himself out as ready to serve the public generally. But the text does not require an ex-

press holding out. It may be done impliedly, as by wide solicitation and other factors * * *" (The Davis case in 79 Colo. 642 is here cited.) 120 P. (2d) 748.

"These cases, we think, clearly establish the law to be that merely because an owner enters into contracts in connection with his service, and in some instances refuses service, is not a controlling factor. If that is correct that must be true also in connection with an owner with limited membership, as in the case at bar, since such limited membership is but another form of an attempted limitation by contract."

In the California case, that of *In Re Plumas-Sierra R. Electric Co-op,* 88 PUR-NS 506, the Commission declared:

"The mere declaration of restrictive purposes set forth in its Articles of Incorporation does not preclude a finding that respondent is serving the public. Although it asserts that membership is a prerequisite to service, its readiness to take on new members or patrons, and the statement of its secretary-treasurer that it has never rejected an application for membership, clearly manifests an intention to serve anyone who can be supplied with power by its existing facilities or by reasonable extensions thereof."

If the "fact" test rather than the charter test is followed in the case at bar, there can be no question but that Union is and has been for a long period of time operating as a public utility because it has not only set out to serve the users in the area in question but has aggressively sought new members and has never rejected a member. Moreover, it has actually served while the utility companies stood by waiting for the population to develop so as to make the operation a profitable one. In view of these facts and in view of the legal principles applicable to recognition of an operation as a public utility, it strikes me as unfair and unrealistic to penalize Union for its failure to obtain recognition as a utility prior to this time.

Public Service emphasizes that this constituted un-

lawful operation and that something in the nature of the unclean hands doctrine should now bar Union from arriving at a status of a utility. In my opinion, there might be a basis for this contention if Union's recognition did result in prejudice to Public Service. In other words, if Union were now granted exclusive rights within the territory so as to force Public Service to backtrack, the latter would have a legitimate complaint. It could then contend that estoppel operated. The Commission, however, avoided this by refusing to give retroactive effect to the Certificate of Union. Thus it is impossible to conclude that Public Service is aggrieved.

It would follow from an application of the "fact" test that Union was a utility at the time it filed its complaint against Public Service in case No. 5108 and that the Commission should have taken jurisdiction of the controversy. It is apparent from the majority opinion that Union is not considered now as a utility and from the language of the majority it might be inferred that it is considered at best as a second class utility. It would seem that its only reason for affirming the granting of a Certificate to Union is that there is no particular objection to this on the part of the other utilities so long as Union is restrained. I find no basis in the briefs for the observation (in the majority opinion) that neither Public Service nor Central objects to the issuance of a Certificate "to render service limited in scope." Public Service has taken strong exception to the recognition of Union as a utility for any purpose. It has proceeded, and I think correctly, on the premise that it is impossible to recognize Union as a utility (as the majority has) and at the same time (for practical purposes) not recognize it as a utility.

*The propriety of the majority holding that even though Union is entitled to utility status it is restricted in its operations to serving the members and customers which it had on January 7, 1957.*

The order of the Commission was that none of the

parties, that is, neither of the utilities nor Union, had acquired exclusive rights in the so-called Appendix A territory. Acting on this premise and in an effort to treat the parties equitably, the Commission in effect prohibited further expansion on the part of any of the parties without their first obtaining a Certificate from the Commission. On this the Commission stated:

"Each party asserts that its territory includes all open ground between its lines and the lines of the next utility neighboring. Each aggressively asserts that it now holds itself out to serve, and actually is serving, all of this intervening territory. Their activities in seeking new business even to the extent of overbuilding one another, bears them out. *In the present circumstances, we find as fact that indeed all of the parties are aggressively serving the territory in issue in this proceeding,* and that new construction by any party may well interfere with the operation of some other party's facilities. This being true, if all three are regulated public utilities, and they are, by our present decision, then none of them can make any extension without entering territory which is being 'served by a utility of like character.' All extensions will thus require prior authority with the obvious exception of extensions made better to serve existing customers, and extensions within and to areas, including cities and towns, already certificated." (Emphasis supplied.)

The Commission noted also that it would not be in the public interest to redistribute lines and customers of the various parties and concluded:

" * * * If the parties are held in approximate status quo for a time, the ends desired can be accomplished with minimal dislocation and maximum benefit to the public and the parties. Caution must be exercised, of course, not to inhibit growth in the meantime."

Its order authorized extension of service to a distance of 300 feet without certification. Its reasoning in arriving at this conclusion was:

"Acting in the expectation that the parties will cooperate in an effort to resolve their differences, we should leave a procedural door ajar for them to adjust these differences seriatim at minimum expense, inconvenience and delay. It appears that extension of service by secondary line to a point more than 300 feet distant from the primary line is not economical, nor do such long secondary extensions hold voltage well or provide good service. Any significant change in status will therefore require extension of primary line. Our statute ('53 C.R.S. 115-3-4), concerning rate changes establishes a pattern suitable to our purpose here, when it provides for a filing to be made, to become effective in a specified time unless sooner suspended. We will base our order on such a pattern."

It implemented the above by ordering:

"All parties shall be permitted, without further authority, to make extension of their facilities, or extensions in the aggregate, which do not exceed 300 feet in length."

A reading of the opinion and findings of the Commission indicates that the matter received careful attention and analysis. The order appeals to me as being equitable in view of the high degree of complexity of the problem which the Commission was required to solve. It would appear that the parties have found it practical as we are told that both Public Service and Union have proceeded to obtain Certificates (as of the time of the filing of the briefs) in at least 100 instances.

In its brief filed December 31, 1958, Union said:

"The Commission by the Decision stated that it was holding that all further specific extensions desired by any one of the three public utilities before it would have to be preceded by an application for authority to construct each such extension, and in advance of construction. This part of the Decision is exactly in line with the authority and requirements of the statute. Under this part of the order, the parties have filed about 100

applications for extensions, all pursuant to the Decision, and all involving requests for this sort of certificate. The Commission has acted thereon and the needed extensions have been built to serve new customers, or new locations, by whichever public utility has obtained the certificate from the Commission. So the development of the area has gone forward in an orderly manner under the provisions of the Decision."

The decision of this Court would upset the balance which has been achieved by means of the carefully conceived and equitable formula of the Commission. The effect of the majority decision is that Public Service and Central, within their respective areas, are entitled to exclusive territorial rights and that Union, even though now held to be a public utility by the Commission and this Court, is hamstrung in future operations. Public Service and Central can now go forward without any kind of Certificate and can expand at will regardless of duplications or conflicts with Union. Union, on the other hand, is told that it must stand still — that it cannot acquire new customers; that it cannot extend its facility except upon a showing that "adequate service is not readily available from Public Service or Central"; that its future operations must be in a regulated straight jacket. Thus the only new customers that Union can serve are the ones that Public Service and Colorado Central find inexpedient to serve.

Apart from its practicable unworkability, the decision is legally untenable in the following respects (among others):

1. This decision cannot be reconciled with the conclusion that Union is a public utility. As a public utility, Union is entitled to all of the rights granted to it by the statute, C.R.S. '53, 115-5-1, which provides that the utility may without the Certificate extend "into territory, either within or without a city and county or city or town, contiguous to its facility, or line, plant or system, and not therefore served by a public utility of like char-

acter, or for an extension of its business." In allowing Public Service and Colorado Central to extend without Certificates, the majority is in conflict with the last clause of 115-5-1, supra, which prohibits extensions which interfere with the operation of other public utilities already constructed. The Commission is, by the majority opinion, effectively enjoined from exercising its statutory duty against Public Service or Colorado Central within the territory in controversy.

2. The interests of the public are supposed to be paramount. The Commission retained jurisdiction of this highly controversial and complex matter in order to administer case to case justice to the parties and so as to provide the public with the best possible service in the area. The Commission no doubt adopted this position in recognition of the fact that Public Service is equipped to serve urban and commercial areas, whereas Union has demonstrated the ability to serve the rural communities. The Commission has indicated that it would be guided by these and other considerations. The majority, however, without legal justification and without regard to the public interest has sweepingly declared that Public Service and Colorado Central have preemptive territorial rights merely upon the basis that they had stood ready to serve.

3. Union argues that our statute does not authorize the granting of territorial certification. They say that our statute recognizes only three kinds of certificates (1) to begin construction of a system, (2) certification to construct an extension, and (3) certification to operate under a franchise granted to it by a city. No specific provision is made in the statute for an area or territorial certification or for a general certificate such as here granted. Utility status is a factual determination. They rely on the decision of this Court in *People v. Pirie,* 78 Colo. 361, 242 P. 72. In this case, *Pirie* sought a Certificate of Public Convenience and Necessity to furnish electricity to the residents of Clear Creek County. The

Commission enjoined him from operating within the limits of Idaho Springs. The issue arose in the case as to whether the order included territory outside of Idaho Springs. This Court held that the district court properly restricted the Commission's order to Idaho Springs alone. The Court said that the applicant had a right to supply the inhabitants of the county outside of Idaho Springs and that the Colorado Power Company which had a franchise (and presumably a Certificate) to render service in Idaho Springs had not been serving the territory outside, the applicant was free to do so. In disposing of the contention of the Attorney General that the Commission had the authority to exclude the applicant from the entire county, the court speaking through Mr. Justice Campbell said:

" * * * To the original application by the defendants for the Idaho Springs certificate objection was made by the Colorado Power Company which at the time, as held by the commission, was furnishing satisfactory service to the city and the certificate was refused. We are not now concerned with the denial order if it is restricted to Idaho Springs. As thus restricted it has been sanctioned by us in the case already cited. Assuming therefore, that Pirie and his successors have not the right to supply the inhabitants of Idaho Springs with electricity, this is not equivalent to saying that they have no right to supply consumers elsewhere in 'territory' outside the municipal limits. The Colorado Power Company has not supplied, but it has refused to extend its service to, the town of Dumont and to other consumers in Clear Creek county outside the limits of Idaho Springs. We hold, therefore, that the district court, in restricting the order of the commission to Idaho Springs, was right, and also right in refusing to enjoin defendants from supplying electricity to the consumers in Clear Creek county not within the limits of that city."

The issue in the above case was similar to that here presented in that it refused to recognize an exclusive

territorial right based upon mere presence. In other words, merely because a utility declares that it is ready, willing and able to serve an area it does not thereby acquire an exclusive right to do so. By holding that Public Service has an area certificate the doctrine of *People v. Pirie,* supra is silently repudiated.

4. By recognizing the territorial rights of Public Service on the basis of an expressed willingness to serve, the Court has in effect reenacted a statute which is popularly known as Section 36 (k) adopted in 1945 and which is reported in Chapter 195, 535, Session Laws 1945. This provision is quoted as follows:

"No cooperative electric association or non-profit corporation or association shall render electric service in territory already served by electric public utilities, whether the latter be municipally or privately owned or in territory which can be reasonably served by an existing public utility and in which territory such public utility does actually construct lines and agree to serve consumers promptly and within a reasonable time, unless a certificate shall first be obtained from the Commission that such service is in the public interest; provided, however, that nothing herein shall require discontinuance of service to consumers to whom service has been rendered heretofore."

However, in the year 1949 this section was *repealed.* Chapter 204, p. 565, Session Laws 1949.

There can be no question but that Section 36 (k) raised the utility to a dominant position and relegated all cooperatives to a servient status, and the majority ruling accomplishes exactly the same thing while at the same time paying lip service to Union as a public utility. It is fair to assume that the Legislature by repealing Section 36 (k) declared a public policy contrary to the philosophy expressed in 36 (k). I now ask how can the Court conscientiously revive this repudiated philosophy.

5. By adopting a position which is much more far reaching and drastic in its implications and effects than

the ruling of the Commission and the district court the majority has now injected into the case basic and fundamental constitutional questions. Furthermore, it has gone outside the issues raised by the briefs in order to do this.

For all of the above reasons, it is my opinion that the decision is ill founded. The Commission's orders and the judgment of the district court should be affirmed with the exception noted above; or in the alternative if it is believed that the Commission's findings are inconsistent in that they failed to recognize the facts indicating Union's utility status prior to 1957 while now recognizing all their installations as those of a utility, I would say that there is ample justification for determining that Union was a utility long prior to the hearings and that Union is entitled to the rights as such which are granted by statute. This would bring about the desired consistency and achieve the Commission's equitable result.

Finally, it should be again repeated that the paramount interest is that of the public. The rights of the parties are important, but these rights must give way when in conflict with the interests of the public. The judgment of the district court and the findings of the Commission recognized this, and should be affirmed.

MR. CHIEF JUSTICE SUTTON and MR. JUSTICE MOORE join in this dissent.